**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

CREW TILE DISTRIBUTION, INC.,

    Plaintiff Counter Defendant -
Appellant,

v.

PORCELANOSA LOS ANGELES, INC.;
PORCELANOSA NEW YORK, INC.;
PORCELANOSA TEXAS, CORP.;
PORVEN, LTD,

    Defendant Counterclaimants -
Appellees,

v.

RYAN A. DAVIS; DARLYNE A. DAVIS;
PARADIGM TILE & STONE
DISTRIBUTORS, LLC,

    Counterclaim Defendants -
Appellants,

and

GLENN L. DAVIS; SHANA L.
BASTEMEYER; G&D DAVIS
HOLDINGS, LLC,

    Counter Defendants.

No. 18-1029
(D.C. No. 1:13-CV-03206-WJM-KMT)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.

_____

This appeal is from a jury verdict which resolved a contract dispute between two businesses. The district court had jurisdiction under 28 U.S.C. § 1332. Plaintiff-Counter Defendant-Appellant Crew Tile Distribution, Inc. sued Defendants-Counterclaimants-Appellees Porcelanosa Los Angeles, Inc., Porcelanosa New York, Inc., Porcelanosa Texas, Inc., and Porven, Ltd. (collectively, "Porcelanosa") for breach of contract. Porcelanosa filed an abuse of process counterclaim against Crew Tile Distribution, Inc., Ryan Davis, Darlyne Davis, and Paradigm Tile & Stone Distributors, LLC (collectively, "Crew Tile"). Prior to trial, Crew Tile filed two motions in limine to exclude other acts evidence and testimony from a handwriting expert. The district court denied both motions. The jury returned a verdict in favor of Porcelanosa on Crew Tile's breach of contract claim and Porcelanosa's abuse of process counterclaim. Crew Tile timely appealed. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

**I**

Crew Tile is a Denver-based business that sold tile manufactured by Porcelanosa, a Spanish company that specializes in high-end tile. Crew Tile is

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

operated by Ryan Davis, a former Porcelanosa employee, and his parents, Glenn and Darlyne Davis. Jack Handley was the Porcelanosa sales representative assigned to Colorado. Crew Tile became one of Handley's clients in 2008.

As Ryan Davis worked to expand Crew Tile, he repeatedly told Handley that he wanted Crew Tile to be Porcelanosa's exclusive distributor in Colorado. In 2009, Crew Tile began to spend money to build a showroom in Denver. At trial, Darlyne Davis testified that Porcelanosa required Crew Tile to build the showroom before Porcelanosa would make Crew Tile its exclusive distributor. Conversely, Handley testified that Crew Tile constructed the showroom on its own initiative, without Porcelanosa's direction.

Regardless of the precise motivation for building the showroom, its construction spurred a meeting between Crew Tile and Porcelanosa on December 14, 2009. The parties dispute whether an exclusive distribution agreement resulted from that meeting. According to Porcelanosa, Handley and his boss toured the Crew Tile showroom with Ryan and Darlyne Davis before having lunch with Ryan and one of his investors. Handley testified that he and Ryan Davis reached "a verbal agreement" "that [Porcelanosa] would support [Crew Tile], as [they] would any customer." App. Vol. VII at 1904. In Crew Tile's version of events, Ryan Davis, Darlyne Davis, and Handley signed three copies of an exclusive distribution agreement after the tour of the showroom.

The document at the heart of this case is the seven-page "Distributor Agreement" that was purportedly executed by Crew Tile and Porcelanosa on

3

December 14, 2009 (the "2009 Agreement"). The 2009 Agreement states that Crew Tile will be the exclusive distributor of Porcelanosa tile in Colorado, excluding Aspen and Pitkin County (where another distributor was active). In exchange, Crew Tile agreed "not to represent or sell other products" that competed with Porcelanosa's tiles. App. Vol. XV at 3886. The 2009 Agreement could be terminated by Porcelanosa "at the end of the [f]ifth year of [the a]greement" if Porcelanosa paid Crew Tile "the sum of [t]wo and [one] half million [dollars] ($2,500,000.00) or [the] present . . . value [of Crew Tile,] whichever is greater." *Id.* at 3890.

Assuming the 2009 Agreement was signed, Crew Tile possesses the only remaining copy. Ryan Davis testified that, of the three copies signed in December 2009, Crew Tile kept two copies and Porcelanosa kept one. Darlyne Davis later lost one of Crew Tile's copies. Consistent with its theory that the 2009 Agreement never existed, Porcelanosa claims that it first received a copy of the 2009 Agreement as part of this litigation. Ryan Davis testified that there are no other drafts or copies of the 2009 Agreement because all negotiations took place over the phone and Handley only brought three hard copies to the December 2009 meeting.

Regardless of which party's testimony about the 2009 Agreement is true, the parties agree that Crew Tile sold Porcelanosa-brand tile from 2009 through the beginning of this lawsuit. In April 2013, Porcelanosa notified Crew Tile that it planned to build its own showroom in Denver and sell its tile directly to customers in Colorado. Ryan Davis objected, telling Porcelanosa that selling directly to customers in Colorado violated the 2009 Agreement. This did not dissuade Porcelanosa. On

4

October 31, 2013, Porcelanosa notified its customers "that the Colorado [m]arket [would] now be serviced by Porcelanosa . . . as of November 1, 2013." App. Vol. I at 78.

In November 2013, Crew Tile initiated this action by suing Porcelanosa for breach of the 2009 Agreement. Porcelanosa counterclaimed for abuse of process, alleging that Crew Tile knew the 2009 Agreement was invalid when it filed its breach of contract claim. Porcelanosa's theory is that Crew Tile knew the 2009 Agreement was invalid because Crew Tile drafted the document itself in April 2013 in an effort to prevent Porcelanosa from opening its own Denver showroom.

Crew Tile filed two motions in limine prior to trial. The first sought to exclude, pursuant to Federal Rule of Evidence 404, testimony about a contested contract between Infinite Flooring & Design Corporation—Ryan Davis's previous company—and Porcelanosa (the "2004 Agreement"). Porcelanosa contends that Ryan Davis forged the 2004 Agreement. In its motion in limine, Crew Tile argued that Porcelanosa's only purpose in seeking admission of the 2004 Agreement was to prove that Ryan Davis is a serial forger, making it more likely that he forged the 2009 Agreement. The district court denied the motion because it found that the 2004 Agreement could be admitted for non-propensity purposes "to prove, among other things, the parties' knowledge of one another's business goals or practices, the existing relationship between the parties, and the parties' opportunity to modify or expand an (allegedly) pre-existing distribution agreement to encompass different or additional products." App. Vol. III at 747.

5

Crew Tile's second motion in limine sought to exclude, pursuant to Federal Rule of Evidence 702, Porcelanosa's handwriting expert's testimony that Handley's signature on the 2009 Agreement was a forgery, that the Porcelanosa representative's signature on the 2004 Agreement was a forgery, that it is "highly probable that" Ryan Davis wrote Handley's signature on the 2009 Agreement, and that Ryan Davis wrote the dates on the 2004 Agreement. As is relevant for this appeal, Crew Tile argued that Porcelanosa's expert, Wendy Carlson, failed to reliably apply her methodology and improperly offered opinions about the authorship of the 2004 and 2009 Agreements. The district court denied the motion, finding that Carlson could testify about the authorship of the Agreements and that Crew Tile could use any deficiencies in Carlson's methodology to impeach her testimony at trial.

The case proceeded to trial. At the close of evidence, Crew Tile moved, pursuant to Federal Rule of Civil Procedure 50(a), for judgment as a matter of law on Porcelanosa's abuse of process counterclaim. The district court denied the motion because it found that Porcelanosa had offered sufficient evidence to prove the elements of its counterclaim.

After a nine-day trial, the jury returned a verdict in favor of Porcelanosa on Crew Tile's breach of contract claim and Porcelanosa's abuse of process counterclaim. The jury awarded Porcelanosa $460,000.00 in damages. Crew Tile then moved, pursuant to Federal Rule of Civil Procedure 59(a)(1), for a new trial. Crew Tile argued that, at trial, Porcelanosa used evidence of the 2004 Agreement for improper character purposes, in violation of Federal Rule of Evidence 404. The

6

district court denied the motion because it found that Porcelanosa primarily used evidence of the 2004 Agreement for permissible non-propensity purposes and that, even if some discussion of the 2004 Agreement was improper, Crew Tile did not suffer prejudice warranting a new trial.

On appeal, Crew Tile argues that it is entitled to a new trial because the district court erred in denying its motions in limine to exclude evidence of the 2004 Agreement, to exclude Carlson's expert handwriting testimony, and for judgment as a matter of law on Porcelanosa's abuse of process counterclaim.

**II**

Before discussing the merits of this appeal, we briefly address whether we are presented with a final appealable order. We ordered supplemental briefing about whether "the district court ha[d] . . . resolved Crew Tile['s] . . . fifth claim for relief: a claim for declaratory relief against Porcelanosa." Dkt. No. 10534168 at 2. Upon review of the parties' briefing, we conclude that we have jurisdiction. In its fifth claim for relief, Crew Tile sought a declaration that the 2009 Agreement was "valid and enforceable." App. Vol. I at 67. The district court "entered [judgment] in favor of [Porcelanosa] and against [Crew Tile] on *all* of [Crew Tile]'s equitable claims." App. Vol. IV at 1053 (emphasis added). Moreover, the jury found in Porcelanosa's favor on Crew Tile's breach of contract claim. Awarding Crew Tile its requested declaratory relief would have been inconsistent with the jury verdict. Because the district court resolved Crew Tile's claim for declaratory relief, and all of the parties' other claims have also been adjudicated, we have a final appealable order for

7

purposes of 28 U.S.C. § 1291. *Anderson Living Tr. v. WPX Energy Prod., LLC.*, 904 F.3d 1135, 1139 (10th Cir. 2018) ("A 'final decision' is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.").

**III**

The two primary issues on appeal are (1) whether evidence of the 2004 Agreement was admissible under Federal Rule of Evidence 404(b) and (2) whether Porcelanosa's handwriting expert's testimony was admissible under Federal Rule of Evidence 702. We will only grant a new trial "based on an evidentiary error if the error had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect."[1] *Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 1202 (10th Cir. 2012) (quotation marks omitted). "When determining whether an error was harmless, we review the record as a whole." *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 659 (10th Cir. 2016) (quotation marks omitted).

**A. Other Acts Evidence**

Crew Tile argues that the district court erred by finding that evidence of the 2004 Agreement was admissible to prove the parties' prior business relationship and

---

[1] Crew Tile does not argue that the cumulative effect of the two alleged evidentiary errors warrants remand for a new trial. *See Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 860 (10th Cir. 2005) ("Cumulative-error analysis . . . aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." (quotation marks omitted)). Crew Tile only mentions cumulative error twice, without any analysis or citation to case law. *See* Aplt. Br. at 40; Aplt. Reply Br. at 15. These passing references are insufficiently developed for us to consider. *Bronson v. Swensen*, 500 F.3d 1099, 1104–05 (10th Cir. 2007).

8

concomitant knowledge of each other's business practices. We review the admission of other acts evidence, pursuant to Federal Rule of Evidence 404(b), for abuse of discretion. *Tanberg v. Sholtis*, 401 F.3d 1151, 1167 (10th Cir. 2005). "The admission of evidence may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact[,] or a manifest error in judgment." *Owner-Operator Indep. Drivers Ass'n, Inc. v. USIS Commercial Servs., Inc.*, 537 F.3d 1184, 1193 (10th Cir. 2008) (quotation marks omitted).

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Other acts evidence "is admissible if four factors are satisfied: (1) the evidence is offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the district court provides an appropriate limiting instruction upon request." *Chavez v. City of Albuquerque*, 402 F.3d 1039, 1046 (10th Cir. 2005).

The district court denied Crew Tile's motion in limine because it found that evidence of the 2004 Agreement was "admissible under Rule 404(b) to prove, among other things, the parties' knowledge of one another's business goals or practices, the existing relationship between the parties, and the parties' opportunity to modify or expand an (allegedly) pre-existing distribution agreement to encompass different or

9

additional products." App. Vol. III at 747. The district court reasoned that "if the 2004 [Agreement] was contemplated or proposed by the Davises[,] but not agreed to by Porcelanosa, that fact would tend to prove Porcelanosa's business practices did not include exclusivity agreements, and that the Davises were aware of that practice" when they filed suit to enforce the 2009 Agreement.[2] *Id.* at 746.

While the district court did state a basis for admission of Rule 404(b) evidence, its ruling is divorced from Porcelanosa's theory of its case—that Ryan Davis forged the 2004 and 2009 Agreements. *See* App. Vol. III at 570 (arguing that evidence of the 2004 Agreement "tends to make the forgery of the [2009] Agreement . . . more probable"). There is no indication that Porcelanosa ever planned to offer evidence of a failed 2004 negotiation to show that Crew Tile knew Porcelanosa had a policy against exclusivity agreements. In fact, Porcelanosa never identified any proper purpose for which it sought to admit evidence of the 2004 Agreement.[3] In its

---

[2] The district court also stated that Crew Tile might seek to admit evidence of the 2004 Agreement to "disprove Porcelanosa's claim that it does not enter into exclusive distribution contracts." App. Vol. III at 746. The problem is that Crew Tile did not want to admit evidence of the 2004 Agreement. Crew Tile moved to exclude "[e]vidence of the 2004 [Agreement because it was] not admissible for any purpose." *Id.* at 534 (emphasis omitted).

[3] On appeal, Porcelanosa argues evidence of the 2004 Agreement shows that "the Davises may have carried out a scheme or plan" because of "the many similarities" between the 2004 and 2009 Agreements, including the parties involved, the fact that the Davises benefited from both agreements, and the fact that Ryan Davis signed both agreements. Aple. Br. at 38–39; *see also id.* at 36 (arguing that the 2004 Agreement was "admissible to prove intent, motive and plan, as well as to establish there was no accident"). Porcelanosa's after-the-fact attempts to justify

Continued . . .

opposition to Crew Tile's motion in limine, Porcelanosa merely parroted Rule 404 by asserting that evidence of the 2004 Agreement was admissible to "demonstrate[ Ryan Davis's] plan, motive, intent, absence of mistake, and lack of accident." *Id.* (citing Fed. R. Evid. 404(b)(2)).

Therefore, the district court allowed Porcelanosa to introduce evidence of the 2004 Agreement for purposes not "implicated [by] the facts presented" in this case. *Chavez*, 402 F.3d at 1046. Because the district court failed to identify a proper relevant purpose for the evidence, it erred in denying Crew Tile's motion in limine. *Id.*

Any question about how Porcelanosa planned to use evidence of the 2004 Agreement could have been answered by consulting the expected testimony of Porcelanosa's witnesses. For example, Porcelanosa intended to call one of its former employees, whose signature purportedly appears on the 2004 Agreement, to testify that he had never discussed or negotiated the 2004 Agreement with Ryan Davis. Porcelanosa's handwriting expert also planned to testify that the Porcelanosa representative's signature on the 2004 Agreement was forged, and that Ryan Davis wrote the dates on the 2004 Agreement. By Porcelanosa's own admission, they wanted to admit this evidence because it "tend[ed] to make the forgery of the [2009] Agreement . . . more probable." App. Vol. III at 570. Once Porcelanosa offered

---

(Cont'd)
admission of the 2004 Agreement do not affect our analysis of the purposes identified by the district court in its order denying Crew Tile's motion in limine.

11

evidence suggesting that Ryan Davis forged the 2004 Agreement, there was a substantial risk the jury would make the impermissible propensity inference that Ryan Davis also forged the 2009 Agreement because forgery is part of his character.

However, the district court's error was harmless because of the limited scope of the order denying the motion in limine. The district court's order only allowed Porcelanosa to admit evidence of the 2004 Agreement to prove the parties' prior business relationship. If Porcelanosa had complied with the district court's order, the jury would have heard little about the 2004 Agreement. Porcelanosa claims that there were no negotiations regarding the 2004 Agreement, and that it only discussed the 2004 Agreement with Crew Tile once. Any further use of the 2004 Agreement at trial was not contemplated by the district court's denial of the motion in limine. However, as will be discussed, Porcelanosa strayed from the limits imposed by the district court's order. But any prejudice from Porcelanosa's unapproved use of the 2004 Agreement is not attributable to the district court's error in denying the motion in limine. *See Huddleston v. United States*, 485 U.S. 681, 691–92 (1988) (explaining that other "acts evidence is to be considered only for the proper purpose for which it was admitted").

In addition to challenging the district court's denial of its motion in limine, Crew Tile also argues that, at trial, Porcelanosa used the 2004 Agreement to prove that forgery fits within Ryan Davis's character. Crew Tile is correct. *See, e.g.*, App. Vol. XIII at 3396 (Porcelanosa's attorney stating, during closing argument, that he was "calling [Ryan Davis] a forger" based on "the evidence [admitted] . . . over the

course of the last eight days"). But Crew Tile neither objected in district court nor argues for plain error review on appeal. If a party fails to object before or at trial, he "waives appellate review absent plain error." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1308 (10th Cir. 2015) (quotation marks omitted). We will not correct an error otherwise reversible under plain error review if the party "fail[s] to argue for plain error and its application on appeal." *Id.* (quotation marks omitted).

Crew Tile's attorneys apparently did not think Crew Tile "was obligated to renew [its] objections each and every time evidence about the 2004 [A]greement was introduced" because the district court denied its motion in limine "prior to trial." Aplt. Reply Br. at 9–10. It is true that "a party need not renew an objection . . . to preserve a claim of error for appeal" "[o]nce the court rules definitively on the record" before trial. Fed. R. Evid. 103(b). But the district court's ruling on the motion in limine did not, and in fact could not, admit evidence of the 2004 Agreement to prove Ryan Davis's propensity for forgery. "Evidence of a[n] . . . other act is *not admissible* to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1) (emphasis added).

The district court's ruling on the motion in limine allowed evidence of the 2004 Agreement for limited non-propensity purposes. When Porcelanosa strayed from these purposes at trial, Crew Tile needed to object. Instead, Crew Tile went along with Porcelanosa's strategy and attempted to counter it by proving that Ryan Davis was not a forger. *See, e.g.*, App. Vol. V at 1159 (Crew Tile's attorney stating,

13

during opening argument, that "one way [Porcelanosa is] going to try to [prove its case] is they're going to try to claim that Mr. Davis is a forger[,] . . . a serial forger"); App. Vol. VI at 1432 (Crew Tile's attorney asking Ryan Davis, on direct examination, "Are you a forger?"); App. Vol. XIII at 3372 (Crew Tile's attorney stating, during closing argument, "If someone's a forger, they're a forger."); *id.* at 3393 (Crew Tile's attorney, during closing argument, characterizing Porcelanosa's theory of the case as, "We're going to say you're forgers. You're a forger."). "Having failed to make a timely objection to the evidence at the time that it was presented and having personally developed [the challenged evidence] . . . , [Crew Tile] waived any right that [it] might have otherwise had to challenge this evidence on appeal." *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1460 (10th Cir. 1990).

## B. Expert Testimony

Crew Tile argues that the district court erred by admitting Porcelanosa's handwriting expert's testimony about the 2009 Agreement, and that the error was prejudicial because the validity of the 2009 Agreement was the central issue in this case.

> To determine whether an expert's opinion is admissible, the district court must undertake a two-step analysis. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). First, the court must determine whether the expert is "qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702). Second, "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*[ *v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)]." *Id.*

*Mathis*, 787 F.3d at 1307.

14

"[W]e review whether the district court applied the proper legal test in admitting expert testimony de novo and the court's application of that standard for abuse of discretion." *Id.* Crew Tile appropriately does not argue that the district court applied an improper legal test. The district court understood its gatekeeping role. App. Vol. II at 490–91 (noting the requirements that an expert witness be qualified and her opinion reliable). Nor does Crew Tile renew its objections to Carlson's qualifications as a handwriting expert. Therefore, the only question before us is whether the district court abused its discretion in determining that Carlson's testimony was reliable. "The admission of evidence may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *Owner-Operator*, 537 F.3d at 1193 (quotation marks omitted).

When considering reliability, "the purpose of the . . . inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222–23 (10th Cir. 2003) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

> To assist in the assessment of reliability, the Supreme Court [has provided] . . . four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation;

15

and (4) whether the theory has been accepted in the scientific community.

*Id.* at 1222 (citing *Daubert*, 509 U.S. at 593–94). "[A] district court does[ not] have to discuss . . . all of the reliability factors" in every case; "[a] district court's gate-keeping function is more flexible than that, requiring the court to focus its attention on the specific factors implicated by the circumstances at hand." *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1190 (10th Cir. 2014). "[O]ther things equal, more complicated challenges demand lengthier discussions while less complicated challenges require less discussion." *Id.*

"Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Dodge*, 328 F.3d at 1222. "Under *Daubert*, 'any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Id.* (alterations omitted) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)).

Carlson's expert report states that "[t]he scientific methodology used in [her] examination consist[ed] of the 'ACE-V' method, which means 'Analyze, Compare, Evaluate[,] and Verify.'" App. Vol. I at 266. "Verification, the fourth stage, involves having a second examiner look at the [samples] being compared." *United States v. Baines*, 573 F.3d 979, 983 (10th Cir. 2009). "[T]he verification stage of the ACE-V process is not the independent peer review of true science." *Id.* at 990. Carlson did not complete the verification step before submitting her expert report

16

because she was concerned that she would not have enough time to get verification before her deadline to provide her report to Porcelanosa's counsel.

The district court found that Carlson's testimony was admissible, even though she did not complete the ACE-V methodology, because her failure to verify only "bears on the weight and credibility of [her] testimony." App. Vol. II at 499. The district court justified its finding by citing *Baines* for the proposition that expert testimony based on an ACE-V methodology is admissible even though "verification adds little to reliability."[4] *Id.* at 498–99 (citing *Baines*, 573 F.3d at 987)). Essentially, the district court reasoned that, because verification is not a significant step in the ACE-V methodology, it is not a necessary step. On the record developed in the district court, this was error.

Almost by definition, when Carlson chose not to verify her opinions so she could meet counsel's deadline, she "completely change[d] a reliable methodology or . . . misapplie[d] that methodology." *Dodge*, 328 F.3d at 1222 (quotation marks omitted). In effect, Carlson based her opinions on an ACE methodology, not an ACE-V methodology. Because Carlson chose to deviate from the methodology identified in her expert report, it was incumbent on Porcelanosa to establish that her opinion was still reliable. *See Attorney Gen. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) ("[W]hen experts apply methodologies in novel ways, they may arrive at conclusions that result in 'too great an analytical gap between the data and

---

[4] Notably, the fingerprint expert in *Baines* verified his opinion, per the ACE-V methodology. 573 F.3d at 983.

the opinion proffered' to be determined reliable." (quoting *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002))). Porcelanosa's only attempt to satisfy this burden was its assertion, based on thirteen conclusory lines of Carlson's deposition testimony, that "independent verification review is not required under ACE-V, only suggested." Supp. App. Vol. VI at 955.

A district court can "satisf[y]" "its gatekeeper obligation" "only if '[it] has sufficient evidence to perform the task.'" *Dodge*, 328 F.3d at 1228 (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)). Here, the district court assessed the reliability of Carlson's testimony without the aid of a *Daubert* hearing. Moreover, Porcelanosa did not offer any evidence to support its contention that Carlson's ACE methodology satisfied Rule 702. As a result, the district court based its finding on one Fourth Circuit case and two district court cases in which expert testimony was admitted despite a failure to complete the verification step of the ACE-V methodology. But none of these cases explain why the ACE methodology is reliable, and certainly none discuss the lack of verification with respect to Carlson's analysis in this case.

It may be that verification adds so little to the reliability of an expert's opinion that there is no real difference between the ACE and ACE-V methodologies. But it might also be true that verification adds just enough to the reliability of the ACE-V methodology to push handwriting analysis over the line from worthless pseudoscience to valuable expert testimony. Porcelanosa's attempt to resolve this uncertainty was lacking. Accordingly, the district court did not have sufficient

18

evidence to perform its gatekeeping function and its decision to admit Carlson's testimony was error.  *Dodge*, 328 F.3d at 1228–29.

Crew Tile also argues that Carlson's testimony is unreliable because she did not properly compare and evaluate the various handwriting samples (steps two and three of ACE-V methodology).  In contrast to Carlson's failure to verify her results, the district court did not abuse its discretion when it found that the quality of Carlson's analysis was less a question of reliability and more an issue of credibility.  *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014) ("[A] district court must admit expert testimony as long as it is based on a reliable methodology.  It is then for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions.").  Crew Tile does not argue that Carlson failed to compare or evaluate the relevant data, just that her comparison and evaluation were inadequately rigorous.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  Crew Tile was free to raise the perceived shortcomings in Carlson's analysis at trial.

Because we conclude that the district court erred when it admitted Carlson's testimony, we need not reach the subsidiary issue of whether Carlson was qualified to testify that it was in fact Ryan Davis who forged Handley's signature on the 2009 Agreement.

We must now determine whether the admission of Carlson's testimony "had a substantial influence on the outcome [of the trial] or leaves one in grave doubt as to whether it had such effect." *Abraham*, 685 F.3d at 1202 (quotation marks omitted). We "may set aside a jury verdict due to erroneously admitted evidence only if [we] reasonably conclude[] that a trial without that evidence would have had a contrary result." *Racher v. Westlake Nursing Home Ltd. P'ship*, 871 F.3d 1152, 1161 (10th Cir. 2017). "[A]n 'important factor in determining whether an error was harmless is the strength of the case in support of the verdict. The risk is greater that a particular error tipped the scales in a close case than in one in which the evidence was extremely one-sided.'" *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 886 (alteration omitted) (10th Cir. 2006) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2883 (2d ed. 1995 & Supp. 2005)).

The prominence and probative value of Carlson's testimony weighs in favor of finding prejudice.[5] *Goebel*, 215 F.3d at 1089 (finding prejudice where wrongfully admitted "testimony was a large part of plaintiff's case because it helped to establish

_____

[5] The district court found that "[a]lthough . . . Carlson was credible as a witness in explaining her opinions and how she reached them, . . . Crew Tile's cross-examination was effective in showing these opinions should be given comparatively lesser weight." App. Vol. IV at 1024 n.8. But the parties still highlighted her testimony for the jury. And, if accepted, her opinion that Ryan Davis forged Handley's signature on the 2009 Agreement would determine the outcomes of Crew Tile's breach of contract claim and Porcelanosa's abuse of process counterclaim. Therefore, even if impeached, Carlson's testimony still had the potential to cause prejudice. *See Adamscheck v. Am. Family Mut. Ins. Co.*, 818 F.3d 576, 589–90 (10th Cir. 2016) ("[N]on-expert evidence [that] support[s a litigant's] theory" is "not a substitute for or cumulative of" an expert's opinion that can tie together the evidence "based on . . . expertise and training.").

20

the . . . causal link between the incident [at issue] . . . and the alleged . . . injury");
*see also Abraham*, 685 F.3d at 1203 ("'[C]onsiderable use of inadmissible evidence during the taking of evidence and during argument' may be sufficient to demonstrate substantial prejudice." (alterations omitted) (quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998))). At trial, the parties acknowledged the significance of Carlson's testimony. In its closing argument, Crew Tile described Carlson as "one of the most important witnesses in this case." App. Vol. XIII at 3371. Crew Tile went so far as to tell the jury, "If you believe her, that she can figure this out from those signatures and that Ryan Davis is a forger, then we're going to lose." *Id.* At the end of its closing argument, Porcelanosa twice reiterated Carlson's testimony that Handley did not sign the 2009 Agreement. *Id.* at 3448, 3449.

That being said, "the presentation of [wrongly admitted expert testimony] might still qualify as harmless error 'if other competent evidence is "sufficiently strong" to permit the conclusion that the improper evidence had no effect on the decision.'" *Storagecraft*, 744 F.3d at 1191 (quoting *Goebel*, 215 F.3d at 1089). Wrongly admitted expert testimony is more likely to be harmless when "the record contain[s] independent, admissible evidence establishing the same proposition to which the expert had testified." *Adamscheck*, 818 F.3d at 589. The district court found that, "even without considering . . . Carlson's testimony," App. Vol. IV at 1024 n.8, "a preponderance of the evidence shows that at the time Crew Tile filed this lawsuit, [it] . . . knew or should have known that the [2009] Agreement was not a valid or enforceable contract," *id.* at 1016.

21

For example, Porcelanosa elicited expert testimony from Michael "Kent" McSparran, a business management consultant with experience reviewing commercial distribution agreements. He testified that the 2009 Agreement "was . . . illogical . . . in terms of what you typically see [in] a distributor agreement." App. Vol. XII at 3126. Further, he was able to locate a template agreement on the internet and, after comparing the template to the 2009 Agreement, offered his expert opinion that the 2009 Agreement was "taken from" the template. *Id.* He also testified that the $2.5 million termination payment in the 2009 Agreement was "unbelievable," "irrational," and "ma[de] no business sense to [him] at all." *Id.* at 3136–37.

Also, Crew Tile's description of the negotiation and execution of the 2009 Agreement was implausible. Ryan Davis testified that there were no written drafts of the 2009 Agreement because all negotiations took place over the phone and Handley brought the only three copies of the document to the December 2009 meeting. Ryan Davis then testified that only one copy of the 2009 Agreement now exists because Crew Tile lost its second copy shortly before filing suit. Moreover, the first time the 2009 Agreement appears in the record, other than the single copy purportedly executed in December 2009, is in an email from a Crew Tile employee to the Davises from April 2013—just after Porcelanosa informed Crew Tile of its intention to build a Denver showroom. As the district court noted, Crew Tile's description of the December 2009 meeting can only be corroborated by testimony from interested parties. The only other person who testified to seeing the 2009 Agreement prior to

April 2013 was Shana Bastemeyer, a former Crew Tile employee and Ryan Davis's fiance. She testified that she saw the 2009 Agreement in June 2011.

In making its findings, the district court "determin[ed] that the testimony offered by the Davises . . . was on the whole less credible than the testimony of the witnesses who established and corroborated Porcelanosa's factual contentions." App. Vol. IV at 1032. Generally, "we give great deference to the district court judge who observed the trial." *Polson v. Davis*, 895 F.2d 705, 711 (10th Cir. 1990). The district court's credibility finding is significant here because the only way to make sense of the parties' competing narratives is to conclude that at least two witnesses—either Ryan and Darlyne Davis or Handley and his boss—perjured themselves on the stand.

Ultimately, we cannot reasonably conclude that the jury would have reached a different verdict if Carlson had not testified. Crew Tile effectively impeached Carlson's testimony, thereby reducing its prejudicial impact. The nine-day trial offered ample other evidence about the parties' business relationship, allowing the jury to form an opinion about the validity of the 2009 Agreement without relying on Carlson's testimony. The jury also heard testimony from all the individuals who attended the meeting at which the 2009 Agreement was purportedly signed. Based on this testimony, and the other evidence offered by the parties, the jury was able to decide whether Crew Tile's or Porcelanosa's narrative was more credible.

**IV**

Crew Tile argues that the district court erred by denying its Rule 50(a) motion for judgment as a matter of law on Porcelanosa's abuse of process counterclaim.

23

Crew Tile maintains that Porcelanosa did not offer sufficient evidence of damages. "The precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b)."[6] *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1219 (10th Cir. 2013) (alteration omitted) (quoting *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006)). This means that a party may not "raise a sufficiency of the evidence claim on appeal without having [renewed it in] a Rule 50(b) motion." *Id.* at 1219 n.11. Crew Tile did not renew its sufficiency of the evidence claim in a Rule 50(b) motion. Therefore, Crew Tile did not preserve the issue for appeal. *Id.* at 1219 & n.11.

## V

We AFFIRM.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

---

[6] In some circumstances, a party may also preserve an issue for appeal by renewing a Rule 50(a) motion via a Rule 59(e) motion that is "filed within the deadline for a Rule 50(b) motion and contain[s] all the information required for a Rule 50(b) motion." *Elm Ridge*, 721 F.3d at 1220 (quotation marks omitted). Crew Tile did not file a Rule 59(e) motion.

18-1029, *Crew Tile Distribution v. Porcelanosa, et al.*

**McHUGH**, Circuit Judge, concurring:

I join in much of the majority's thoughtful analysis and in its conclusion that the district court's judgment should be affirmed. I write separately, however, to explain where my analysis differs.

## I. OTHER ACTS EVIDENCE

To begin, I am in accord with much of the majority's criticism of the district court's treatment of the 2004 Agreement. But, unlike the majority, I would hold the 2004 Agreement was properly admissible to place the parties' business relationship in context.

The 2004 Agreement is part of the comprehensive history of the parties' relationship and is relevant to the ultimate question of whether the 2009 Agreement is genuine. In its opposition to the motion in limine, Porcelanosa explained that it terminated Ryan Davis's employment with Porcelanosa due to an "undisclosed conflict of interest" based on his involvement with Infinite Flooring. App. at 566. Yet, nine days later, Porcelanosa purportedly executed the 2004 Agreement with Ryan Davis. And Infinite Flooring allegedly placed the signed agreement in a folder and took no further action on it at that time. Then three months before the 2009 Agreement was allegedly signed, Crew Tile Distribution (through Ryan Davis) claimed in a letter to Porcelanosa that Crew Tile was aggressively pushing ventilated facades and "will continue to do so, per our exclusivity agreement with Porcelanosa on the system." Suppl. App. at 1979. When Ryan Davis later forwarded a copy of the 2004 Agreement to Porcelanosa as support for the referenced "exclusivity agreement," Jack Handley and Paco Montilla

determined the agreement invalid. Thus, in Porcelanosa's view, Ryan Davis had produced a fake 2004 Agreement in an attempt to leverage an exclusivity agreement. That understanding is relevant to the likelihood that Porcelanosa would have entered into an even larger exclusivity agreement with the Davises and Crew Tile just months later. And because the 2004 Agreement had a seven-year term, Porcelanosa argued that its existence would further call into question the 2009 Agreement, which had an exclusivity provision that was in direct conflict with the exclusivity provision in the 2004 Agreement. Further, Ryan Davis's knowledge that Porcelanosa disputed the veracity of the 2004 Agreement, and that it conflicted with the terms of the 2009 Agreement, would be relevant to whether he knew the 2009 Agreement was not genuine. So, I would conclude that the district court was correct that the 2004 Agreement had some limited proper evidentiary purpose under Federal Rule of Evidence 404(b).

I agree with the majority, however, that Crew Tile waived any right to challenge that evidence on appeal by failing to object when Porcelanosa strayed from those proper purposes at trial. But I see no need to determine when or whether Porcelanosa strayed from those proper purposes because I would hold that Crew Title waived any objection to the use of the 2004 Agreement for propensity purposes by "opening the door" to that use during its opening statement.

"Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000). This is true even when a party that sought to keep evidence out in an unsuccessful motion in limine offers the evidence itself to draw the sting from the opposing party's potential

2

use of the evidence. *Id*. at 758. The Supreme Court reached this conclusion for two relevant reasons. First, "in limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Id*. at 758 n.3. Allowing a party to proactively draw the sting "would deprive the trial court of the opportunity to change its mind after hearing all of the [party opposing the evidence's] testimony." *Id*. Second, "[a]ny possible harm flowing from a district court's in limine ruling permitting [admission of the objected-to evidence] is wholly speculative." *Id.* at 759 (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)). It is only when the opposing party exercises its option to admit the evidence that "an appellate court [is] confronted with a case where, under the normal rules of trial, the [allegedly aggrieved party] can claim the denial of a substantial right if in fact the district court's in limine ruling proved to be erroneous." *Id*. Therefore, a party who "preemptively introduces [the objectionable evidence] on direct examination may not on appeal claim that the admission of such evidence was error." *Id*. And "[u]nder *Ohler*, the party introducing the evidence waives—rather than forfeits— any objection to its admission, meaning we do not consider the claim at all, even under the forgiving plain error standard." *Vehicle Market Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1258 (10th Cir. 2016) (internal quotation marks omitted). If a party "preemptively elicited [the offending] testimony on direct examination, it cannot now appeal either the district court's ruling in limine" or the opposing party's use of the evidence. *Id.* (internal quotation marks omitted).

Although *Ohler* was decided in the criminal context, we have explicitly held it applies in the civil context. *Vehicle Market Research*, 839 F.3d at 1258 n.5. Additionally, while *Ohler* discusses "opening the door" during direct examination, we have held the same rule applies to opening statements. *EEOC v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017); *see also United States v. Chavez*, 229 F.3d 946, 952 (10th Cir. 2000) ("It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party.").

In its opening statement here, Crew Tile discussed the 2004 Agreement, indicated that Porcelanosa claimed it was forged, and explained that Porcelanosa would argue that the alleged 2004 forgery was proof that the 2009 Agreement was also forged:

> Now, so why are we here? Because the defendants think they can convince you to shut your eyes, close your ears, and ignore the actual facts in this case. And one way they're going to try to do that is they're going to try to claim that Mr. Davis is a forger. In fact, they're going to try to claim that he's a serial forger. That not only did he forge the contract in this case, but that when he worked as an employee years ago, that he forged the contract back then.
> . . . .
> In fact, ladies and gentlemen, when you hear the evidence -- when you hear the opening statement of defense counsel . . . he [will] talk[] about this so called first forgery from years ago . . . .

App. at 1159–60.

I would conclude that Crew Tile affirmatively waived any error in the district court's ruling in limine by opening the door to use for propensity purposes during its opening statement. Thus, I would hold Crew Tile has waived any right to challenge the alleged improper use of the 2004 Agreement.

## II.  EXPERT TESTIMONY

Where I depart most significantly from the majority is in the assessment of the district court's admission of Ms. Carlson's expert testimony under Federal Rule of Evidence 702. I would hold the district court did not exceed its broad discretion in admitting this testimony.

### A.  *Lack of Verification*

The district court admitted Ms. Carlson's testimony despite the lack of the "verification" step of ACE-V, because the absence of actual verification could be addressed through cross examination. Thus, I would not characterize the district court as concluding that "because verification is not a significant step in the ACE-V methodology, it is not a necessary step." Maj. Op. at 17. Instead, I read the district court's opinion as concluding the methodology requires only that the ACE steps be peer reviewable--not that they have been peer reviewed.

In reaching that conclusion, the district court relied on a technical note published in the Journal of Forensic Identification discussing the proper use of ACE-V. The court recognized that "'[m]any sources have described the verification process of the ACE-V to be a repeat of the ACE process done by another examiner,' while '[o]ther sources describe verification as a confirmation of the original examiner's conclusion.'" App. at 496 (alterations in original) (quoting Michele Triplett & Lauren Cooney, *Technical Note: The Etiology of ACE-V and its Proper Use: An Exploration of the Relationship Between ACE-V and the Scientific Method of Hypothesis Testing*, 56 (3) Journal of Forensic Identification 350 (2006)). "The goal should be 'to assess whether a conclusion was

5

arrived at accurately, using procedures that are tested and accepted.'" *Id.* (quoting Triplett & Cooney at 348). To this end, "conclusions do not always need to be peer reviewed, but they need to be peer reviewable." *Id.* at 497 (quoting Triplett & Cooney at 349). The district court noted that "testing" and "peer review" are only two of the factors set out in *Daubert*, and "independent testing is not the sine qua non of admissibility under *Daubert*." *Id.* at 498 (quoting *McCoy v. Whirlpool Corp.*, Nos. Civ.A. 02-2064-KHV, Civ.A. 02-2229-KHV, Civ.A. 02–2230-KHV, Civ.A. 02-2231-KHV, 2003 WL 1923016, at *3 (D. Kan. Apr. 21, 2003).

Based on this analysis, the district court concluded that "the role of verification in [the ACE-V] context is primarily to make the expert's work 'reviewable,' even if it is not actually reviewed." *Id.* at 499. And the verification step would not "directly alter the examination and review completed under the first three steps of ACE-V." *Id.* at 499–500. The district court further noted that Crew Tile did "not argue that Ms. Carlson's work is not 'reviewable,' nor that an expert of [Crew Tile's] choosing could not have reviewed and critiqued the analysis based on the work shown in her report and supporting materials." *Id.* at 499. Therefore, to the extent that Ms. Carlson's analysis was "flawed or flimsy," the district court determined the lawyers could "bring that fact to the jury's attention" and it would be up to the jury to decide for itself whether it agreed with the expert. *Id.* at 500 (quoting *United States v. Crisp*, 324 F.3d 261, 271 (4th Cir. 2003)).

Crew Tile does not challenge the district court's conclusion that the verification stage requires only that an expert's work and conclusion be reviewable. Rather, it continues to argue on appeal that the failure to obtain actual verification renders the

6

application of the ACE-V methodology unreliable. For me, resolution of this issue turns on the standard of review.

The district court "has wide latitude in deciding whether to exclude expert testimony." *Hall v. Conoco Inc.*, 886 F.3d 1308, 1311 (10th Cir. 2018) (internal quotation marks omitted). Because of the district court's thorough analysis and reliance on technical papers in determining that the verification step of ACE-V requires only that a conclusion be reviewable, I would not conclude that the district court's decision was "arbitrary, capricious, whimsical or manifestly unreasonable," or "that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chapman*, 839 F.3d 1232, 1237 (10th Cir. 2016) (quotation marks omitted). Thus, I would hold that the district court did not exceed its broad discretion in admitting the expert testimony.

## B.    *Testimony that Ryan Davis Forged 2009 Signature*

Because I would conclude the district court did not abuse its discretion in admitting Ms. Carlson's testimony, I would reach the issue of whether the district court abused its discretion in allowing Ms. Carlson to testify that Ryan Davis likely forged Mr. Handley's signature on the 2009 Agreement. But I would not resolve this question on the merits; I would instead reject it for lack of preservation. Although Crew Tile argued to the district court that Ms. Carlson should not be permitted to opine that the dates on the 2004 Agreement were authored by Ryan Davis (Ms. Carlson's proposed opinion number 4), it did not object to Ms. Carlson's opinion that Ryan Davis likely forged Mr. Handley's signature on the 2009 Agreement (Ms. Carlson's proposed opinion number 3). Because

7

Crew Tile does not argue for plain error review on appeal, it has waived this argument and I would not consider it further. *United States v. Roach*, 896 F.3d 1185, 1192 (10th Cir. 2018).

### III. CONCLUSION

Although I reach different conclusions on individual issues, I agree with the majority that the district court's judgment should be affirmed. Accordingly, I concur.