**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JUSTIN LANE FOUST,

     Defendant - Appellant.

No. 19-6161

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:18-CR-00011-F-1)**
_____

Howard A. Pincus, Assistant Federal Public Defender (and Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant - Appellant.

Jessica L. Perry, Assistant United States Attorney (and Timothy J. Downing, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff - Appellee.
_____

Before **McHUGH**, **KELLY**, and **EID**, Circuit Judges.
_____

**KELLY**, Circuit Judge.
_____

     Defendant-Appellant Justin Foust appeals from his conviction on six counts of

wire fraud, and one count each of aggravated identity theft and money laundering.

He was sentenced to 121 months' imprisonment and three years' supervised release.

Briefly, Mr. Foust's company, Platinum Express, LLC, submitted false and fraudulent invoices to its customer, Chesapeake Energy Corporation ("Chesapeake"). Chesapeake identified more than $4.5 million that it had paid out on these invoices. Mr. Foust did not deny that the invoices were improper and that Platinum Express had not performed the work. But he denied that he had forged the signatures and employee identification numbers of Chesapeake employees. A handwriting expert testified otherwise regarding invoices associated with Chesapeake employee Bobby Gene Putman.[1] The jury convicted Mr. Foust on the wire-fraud and aggravated-identity-theft counts associated with these invoices.

On appeal, Mr. Foust argues that the district court abused its discretion by allowing the handwriting expert to testify at trial. He contends that (1) the government did not adequately show that the expert's methodology was reliable and (2) the handwriting expert used unreliable data in reaching his opinion. This court has jurisdiction under 28 U.S.C. § 1291, and we affirm.

## Background

Mr. Foust was a production foreman at Chesapeake where he operated oil and gas wells. In 2011, he left Chesapeake to start Platinum Express, which performed water-hauling services for oil and gas companies. Not long after forming, Platinum Express

---

[1] Both the government and Mr. Foust use the spelling "Putnam" in their briefs, but at trial his name was spelled "Putman." 3 R. 85. We will use "Putman" in this opinion.

entered into a contract with Chesapeake. A few years later, Chesapeake employees discovered the fraudulent invoices submitted by Platinum Express. Chesapeake began investigating the matter and told Mr. Foust that it was going to exercise its contractual right to examine Platinum Express' computers and business records. But while Chesapeake investigators were travelling to the Platinum Express office, Mr. Foust told them that someone had broken into the office and stolen two computers. The investigating sheriff's deputy believed the break-in was staged by Mr. Foust. Chesapeake decided to turn the investigation over to the FBI.

When the FBI initially talked to Mr. Foust, he blamed the fraudulent invoices on Mr. Lucas, Platinum Express' general manager, and Ms. Lucas, the office manager. However, the agents could not connect the Lucases to the fraudulent invoices, so they determined that Mr. Foust was likely involved. The FBI learned, among other things, that: Mr. Foust had access to and controlled the Platinum Express account; all of the checks from Chesapeake were traced into the Platinum Express account and the Fousts used that account for personal expenses; the Fousts received business profits; and Mr. Foust was knowledgeable of Chesapeake's practices due to his previous employment there.

Prior to trial, Mr. Foust requested a Daubert hearing to determine whether the government's handwriting expert, Arthur Linville, would be allowed to testify. Mr. Linville is an experienced, board-certified forensic document examiner and was initially retained by Chesapeake during its investigation. During the hearing he explained his methodology, which consists of comparing the known writing with "exemplars of the

3

suspect's writing." 2 R. 15.  He looks for common characteristics between the exemplars as well as any unexplained differences.  When comparing exemplars, Mr. Linville considers their "[q]uantity, quality and comparability."  Id. at 29.  He first determines the number of exemplars needed for a comparison, which depends on the range of variation in an individual's handwriting.  He considers whether an exemplar was written "in the normal course of business" and prefers "relatively contemporaneous" writings "within a year or two" of each other.  Id. at 28–29.  However, Mr. Linville explained that the necessary timing can vary noting that change in handwriting over time is "somewhat overstated."  Id. at 43–44.  Mr. Linville follows American Society for Testing and Materials ("ASTM") standards but conceded at the hearing that they are "pretty basic" and not "hard-and-fast rules."  Id. at 57–59.  Finally, he mentioned that studies have found that forensic document examiners had a less than 1% error rate, while lay people had a 6.5% error rate.

While explaining his analysis of this case, Mr. Linville sorted the invoices by the type of forgery, which included "cut and paste" forgeries and "freehand" forgeries.  Id. at 18.  The fraudulent invoices associated with another Chesapeake employee (Jeff Willis) were cut-and-paste forgeries.  Mr. Linville could not provide an opinion on these forgeries and the jury ultimately hung on the counts associated with them.  On the other hand, the invoices with Bobby Gene Putman's signatures were freehand forgeries.  Mr. Linville testified that the invoices with Mr. Putman's signature "absolutely were not Mr. Putman's signature" but were written in the natural hand of the writer — i.e., the author did not try to recreate the signature.  Id. at 26–27.  He was able to rule out the Lucases

4

because of the different style of numbers and the quality of penmanship. As to Mr. Foust, Mr. Linville compared the invoices to exemplars of Mr. Foust's writing from 2002, 2011, and 2017. Mr. Linville opined that Mr. Foust forged Mr. Putman's signature because of similarities in pictorial appearance, skill, and other unique characteristics in the numbers.

Next, the district court laid out the standards it would apply under Rule 702 and summarized Mr. Linville's testimony. The court concluded that Mr. Linville was using an accepted methodology and reliably applied the methodology to the facts of the case. Although the court noted that handwriting comparison looks like "black magic" to the "untrained eye," it was still able to look at the samples and determine whether there were facts supporting Mr. Linville's opinion. Id. at 70–71. Therefore, the court concluded that Mr. Linville's testimony was admissible.

**Discussion**

We review the district court's application of Rule 702 and Daubert for abuse of discretion. Etherton v. Owners Ins. Co., 829 F.3d 1209, 1216 (10th Cir. 2016). We give the district court substantial deference, reversing only when its ruling was "arbitrary, capricious, whimsical or manifestly unreasonable" or when it made "a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Id. (quoting Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003)). The district court's discretion extends to both how it assessed the expert's

reliability as well as its "ultimate determination of reliability."  Id. (quoting Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 990 (10th Cir. 2003)).

Federal Rule of Evidence 702 requires federal courts to ensure that expert testimony "is not only relevant, but reliable."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  A district court first determines whether the witness has the requisite "knowledge, skill, experience, training, or education" to provide an expert opinion.  Fed. R. Evid. 702; United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009).  Next, it "determine[s] whether the expert's opinion is reliable by assessing the underlying reasoning and methodology."  Nacchio, 555 F.3d at 1241.  If either of these steps renders the expert's opinion unreliable, the testimony is inadmissible.  Id.

On appeal, Mr. Foust does not challenge Mr. Linville's qualifications but instead raises two arguments aimed at the reliability of his methodology.  First, he argues that the government did not meet its burden of establishing that Mr. Linville's methodology was reliable under the Daubert/Kumho Tire test.  Second, he argues that Mr. Linville did not use reliable data — thus, making his method unreliable — because the exemplars were not sufficiently contemporaneous.  We disagree and conclude the district court did not abuse its discretion in admitting the testimony.

**A. Mr. Linville's Methodology**

Beginning with Mr. Foust's broader argument, he contends that the prosecution failed to establish that Mr. Linville's methodology was reliable.  In Daubert, the Supreme Court highlighted a number of considerations relevant to this

6

inquiry: (1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community. 509 U.S. at 593–94. However, this list is not exclusive, and the test for reliability is flexible. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999). Handwriting analysis is primarily an experience-based expertise, as opposed to science-based, which could make some Daubert factors less relevant than others. See id. Still, "some of Daubert's questions can help to evaluate the reliability even of experience-based testimony." Id. at 151.

Turning to the factors, we begin with whether Mr. Linville's method can be (and has been) tested. Although it appears that testing of handwriting comparison "mostly falls short of the rigors demanded by the ideals of science," it is still subject to less rigorous forms of testing. See United States v. Baines, 573 F.3d 979, 990 (10th Cir. 2009) (discussing Daubert factors in the context of fingerprint analysis). Testing may be done through "criminal investigation[ and] court proceedings," as well as certification and proficiency exams. Id. Here, Mr. Linville has undergone years of training, has been certified by organizations of forensic examiners, and has rendered expert opinions in hundreds of cases. Therefore, this factor provides some support for admissibility.

Furthermore, the general-acceptance factor weighs in favor of admissibility. As the district court noted, "based on his description of how his science is practiced and the way it has apparently been practiced for a good many years, my conclusion is

7

[] he is using accepted methodologies." 2 R. 70. Mr. Linville testified that handwriting analysis is a comparative process and two fundamental principles underlie the process: (1) no two individuals' handwriting is the same and (2) an individual's own handwriting is never exactly the same. He has also received training through forensic organizations and federal agencies, which demonstrates some consensus in the field. Although, as Mr. Foust argues, acceptance by unbiased experts is always better, that does not mean this factor cannot support admission. See Baines, 573 F.3d at 991. And given the widespread acceptance of handwriting comparison through the years, we think this factor supports admissibility in this case. See, e.g., United States v. Crisp, 324 F.3d 261, 271 (4th Cir. 2003).

On the other hand, the standards, peer-review, and error-rate factors do not necessarily support admission. Mr. Foust was correct to point out that Mr. Linville's testimony regarding peer review and error rates was lacking. Mr. Linville stated that he participated as a guest editorial board member on a peer-reviewed forensic journal; however, there was no testimony regarding whether his own methodology had been peer reviewed. Mr. Linville also testified generically that forensic examiners have a less than 1% error rate while lay people have a 6.5% error rate, but it is not clear that the study concerned the process of identifying the author. While there may be available evidence regarding peer review and error rates, it was not adequately presented at the Daubert hearing to support admission.

Finally, Mr. Linville follows the ASTM standards for his analysis, but he testified that these guidelines were "pretty basic" and not "hard-and-fast rules." 2 R. 59. Much

8

like fingerprint analysis, handwriting comparison relies a lot "on the subjective judgment of the analyst," which may cut against admissibility. Baines, 573 F.3d at 991. With that said, the nature of handwriting comparison as an experience-based expertise lends itself to greater reliance on subjectivity when compared to science-based expertise. So while this factor does not necessarily support admission, we think it has less relevance in the specific context of handwriting comparison. See Kumho Tire, 526 U.S. at 150.

On balance, our review of the Daubert factors provided mixed results, however we recognize that they are "meant to be helpful, not definitive." Id. at 151. This understanding is particularly important because handwriting comparison is not a traditional science, and the Daubert factors do not always correspond perfectly. See id. at 150. During the hearing, the district court heard extensive testimony about Mr. Linville's methodology and analysis in this case and observed that whether the expert used accepted methodologies really had not been questioned. 2 R. 70. We recognize that there has been criticism of handwriting expertise in both the courts and academic literature. See, e.g., Almeciga v. Ctr. for Investigative Reporting, Inc., 185 F. Supp. 3d 401 (S.D.N.Y. 2016); Jennifer L. Mnookin, Scripting Expertise: The History of Handwriting Identification Evidence and the Judicial Construction of Reliability, 87 Va. L. Rev. 1723 (2001). However, given our standard of review, the district court did not abuse its discretion in finding Mr. Linville's methodology reliable.

### B. Mr. Linville's Underlying Data

Mr. Foust next argues that Mr. Linville's opinion is based on faulty data that renders his methodology unreliable. Specifically, he highlights Mr. Linville's use of

9

exemplars outside his one-to-two-year range for contemporaneousness, thus violating his own methodology. We disagree.

To start, Mr. Foust overstates Mr. Linville's testimony. When discussing the timing of exemplars, Mr. Linville said, "it would be nice if they were written relatively contemporaneous in time with the questioned writing, and that can be within a year or two preceding or following the documents at issue." 2 R. 29. He noted that this was his "personal preference" and it was a view "expressed in text that [he] own[s]." 2 R. 43. He elaborated further that the need for contemporaneous exemplars varies, explaining that change in handwriting is "somewhat overstated" but there can be circumstances where very recent exemplars are needed. 2 R. 43–44. Mr. Foust's suggestion that the two-year cutoff is a strict rule under Mr. Linville's methodology is not supported by the record.

Furthermore, Mr. Linville relied primarily on the 2011 and 2017 exemplars that were two-and-a-half months and eight-months outside the two-year range. Mr. Foust's quarrel about the two-year cutoff goes to the weight, not the admissibility of Mr. Linville's testimony. It is "for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions." In re Urethane Antitrust Litig., 768 F.3d 1245, 1263 (10th Cir. 2014). Not every issue raised about an expert's opinion requires the testimony to be excluded. Instead, many of those concerns can be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Daubert, 509 U.S. at 596. Indeed, Mr. Foust used much of his cross-examination to discredit the exemplars' reliability.

10

The district court also instructed the jury that it is not required to accept opinion testimony and that it is free to give the testimony as much weight as the jury thinks it deserves.  1 R. 320.

Because we believe this issue concerns the data's reliability — as opposed to the methodology's reliability as a whole — Mr. Foust's reliance on a nonprecedential case, Crew Tile, is inapt.  See Crew Tile Distrib., Inc. v. Porcelanosa L.A., Inc., 763 F. App'x 787 (10th Cir. 2019) (unpublished).  In that case, we concluded that the district court erred by admitting a handwriting expert's testimony where the expert failed to complete the verification step of her methodology.  Id. at 797–98.  We reasoned that by skipping that step the expert had "completely changed a reliable methodology" or "misapplied that methodology."  Id. at 797 (alteration and citation omitted).  Importantly, we noted that the district court did not conduct a Daubert hearing and the party failed to show that the methodology was still reliable without the missing step.  Id. at 797.  Here, the district court conducted a Daubert hearing where Mr. Linville testified precisely about how the importance of contemporaneous exemplars can vary.  Mr. Linville did not skip a step or change his methodology.

AFFIRMED.