**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 24-7044

JORDAN WAYNE HOLT,

    Defendant - Appellant.
_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-00205-JFH-1)**
_____

Michael Gomez, Deputy Federal Public Defender (Cuauhtemoc Ortega, Federal Public Defender, with him on the briefs), Los Angeles, California, for Defendant-Appellant.

William A. Glaser, Attorney, Appellate Section (Antoinette T. Bacon, Supervisory Official, with him on the brief), Criminal Division, United States Department of Justice, Washington, D.C., for Plaintiff-Appellee.
_____

Before **HOLMES**, Chief Judge, **MORITZ** and **ROSSMAN**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

    During a fistfight that escalated into a gunfight, Jordan Holt fired over 20 rounds from an AK-47 into a crowd, and Larintino Scales was mortally wounded. A jury convicted Holt of voluntary manslaughter in Indian country and being a felon in

possession of a firearm. The district court departed upward from Holt's sentencing range and imposed the statutory maximum 15-year sentence.

Holt appeals his voluntary-manslaughter conviction, alleging three trial errors: that the government spoliated—that is, destroyed—potentially exculpatory evidence in bad faith, that the district court improperly admitted expert testimony on bullet trajectories, and that the prosecutor's closing argument prejudicially misstated the law of self-defense. He additionally contends that his sentence is substantively unreasonable. We reject Holt's arguments.

First, the district court did not clearly err in concluding that the allegedly spoliated evidence—a purported bullet fragment discovered at the scene five months after the incident—lacked potentially exculpatory value. Holt fails to show testing could have connected the late-discovered fragment to a gun used in the gunfight, and other evidence already demonstrated that bullets were fired in Holt's general direction. Next, assuming the district court legally erred in allowing the government expert's qualifications to stand in for the reliability of his opinions, the error was harmless because the trial evidence established reliability. And the district court did not otherwise abuse its discretion in finding the expert qualified. Nor did the prosecutor's statements, when considered in context, misstate the law of self-defense. Last, Holt's sentence is not substantively unreasonable; the district court provided a thorough explanation that tied Holt's sentence to many of the sentencing factors. Finding no error, we affirm.

## Background

This appeal stems from a prearranged fistfight that turned lethal. In late July 2019, Lauren Hefner and her boyfriend Tralyn French stole around $10,000 from Hefner's ex-boyfriend, Sebastian Yanez. On July 31, 2019, Yanez—accompanied by Holt—went to confront Hefner and French at French's home about the theft. Hefner described the men as "talking mess to each other" and said that French was mainly trying to keep his sister, who was also present, from attacking Holt. R. vol. 1, 1063.

The next day, Yanez and French agreed to meet up at an apartment complex in Idabel, Oklahoma, to settle the dispute with a fistfight. When Yanez stopped at Holt's home before going to the apartment complex, Holt saw an AK-47 in the front seat of Yanez's vehicle. Holt took the weapon and told Yanez to "just fight" French. *Id.* at 2112. Holt put the weapon in the backseat of his vehicle and drove separately to the designated apartment complex. Yanez drove with his cousins, Adrian and Carolina Valdez; Adrian carried a revolver. French arrived with Hefner and his brother. His sister arrived separately.

A large crowd of somewhere between 15 and 50 people gathered to watch the fight, including Scales. Holt saw that Scales was armed, and he suspected that several other bystanders were also armed, based on their body language. Trial testimony confirmed that other bystanders were, in fact, armed. In response, Holt retrieved the AK-47 from his vehicle and remained near his car, which was parked behind a dumpster surrounded by a sheet-metal fence on three sides. Yanez and French began fighting. When Yanez gained the upper hand, French's siblings jumped in, hitting

3

and kicking Yanez in the head. Adrian Valdez then fired his revolver either into the ground or the air.

Beyond this point, the evidence becomes less clear, but witnesses testified that three shots were fired. Holt and Carolina Valdez testified that Scales fired those three shots. Another witness testified that she never saw Scales shoot or hold a gun but then admitted on cross-examination that Scales fired his gun before Holt did. Three other witnesses could not say who fired these three shots.

In any event, in response to those shots, Holt ducked behind the dumpster and began firing the AK-47 in the general direction of the crowd. He ultimately fired at least 22 rounds, and the crowd scattered. Officers recovered cartridge casings matching the caliber of Holt's rifle in an area near the dumpster. And they recovered 17 bullet casings from at least three different 9mm guns around where the crowd had been.

Scales was wounded during the shooting, and he died later at the hospital. An autopsy revealed that a deformed bullet fragment had entered Scales's forehead. The medical examiner initially opined that Scales had been shot at close range by a small-caliber weapon, citing what looked like soot on Scales's forehead. But when investigators asked if Scales's injury could have been caused by a bullet from a high-powered rifle that had ricocheted off another surface, the medical examiner agreed that was also possible.

The government indicted Holt on six counts related to Scales's death: first-and second-degree murder in Indian country, using a firearm in furtherance of the

murders in violation of 18 U.S.C. § 924(c), killing someone in the course of a § 924(c) offense, voluntary manslaughter in Indian country, and being a felon in possession of a firearm. Holt's defense was two-pronged: he argued self-defense and contended that the government failed to prove beyond a reasonable doubt that he, rather than one of the 9mm-armed onlookers, caused Scales's death.

Related to his self-defense theory, Holt filed a pretrial spoliation motion, asserting that law enforcement destroyed a purported bullet fragment in bad faith. The fragment was discovered at the scene five months after the shooting, inside the sheet-metal fence surrounding the dumpster that Holt ducked behind.[1] Law enforcement chose not to retain the fragment because over five months had passed since the gunfight. But according to Holt, this fragment could have supported his self-defense theory by showing that someone had been shooting in his direction. The district court determined that Holt could not "link the bullet fragment to the shooting in this matter" because too much time had passed between the gunfight and the discovery of the fragment. R. vol. 1, 562. It therefore found no potentially exculpatory value and denied Holt's spoliation motion.

Related to his causation theory of defense, Holt sought to exclude the expert testimony of Brad Knight, a crime-scene investigator with the Oklahoma State Bureau of Investigation (OSBI). The government proffered Knight as an expert in

---

[1] An attorney representing Adrian Valdez discovered this piece of evidence when visiting the scene in January 2020. The fragment appeared to have penetrated the sheet metal, struck a post, and fallen to the ground.

5

"crime[-]scene investigation, shooting reconstruction/trajectories, and firearms." *Id.* at 89. Knight's expert report described the scene and reconstructed the shots fired. He concluded that the bullet that killed Scales was fired westward from where Holt was located, "struck [a] minivan, perforated the driver's side C-pillar, fragmented, and a portion of the bullet core or fragment continued west over the top of [another vehicle] and struck Scales." *Id.* at 235 (cleaned up). Holt argued that Knight's report, to the extent it discussed Scales's wounds, involved "rendering . . . medical opinions" "suited for a qualified forensic pathologist," which Knight was not. *Id.* at 226. He also broadly argued that Knight's report lacked indicia of reliability. The district court denied Holt's motion and permitted Knight's testimony, opining that expertise in bullet trajectories "[p]resumably" includes expertise in analyzing an entry wound's impact on a bullet's likely trajectory. *Id.* at 568.

At trial, the parties produced the evidence described above, including various eyewitness accounts (including from Holt himself), discussion of the unpreserved bullet fragment, and Knight's trajectory testimony. Before closing arguments, the district court instructed the jury, including on self-defense. During the government's closing, the defense unsuccessfully objected to the prosecutor's comments on self-defense. The jury convicted Holt of voluntary manslaughter and being a felon in possession of a firearm. It acquitted him of all other charges.

At sentencing, the district court adopted the presentence investigation report (PSR), setting Holt's total offense level at 29, his criminal history at I, and his sentencing range under the United States Sentencing Guidelines (U.S.S.G. or the

6

Guidelines) at 87 to 108 months. Although Holt requested a sentence at the low end of that range, the district court granted the government's motion for an upward departure based on "factors . . . that separate [Holt] from the heartland of similarly situated defendants." R. vol. 3, 107; *see also* U.S.S.G. § 5K2.0(a)(3). It departed upward five levels, which increased the sentencing range to 151 to 188 months. And it then concluded that the statutory maximum sentence of 180 months for voluntary manslaughter was an appropriate sentence under the 18 U.S.C. § 3553(a) sentencing factors.[2] *See* 18 U.S.C. § 1112(b) (setting statutory maximum).

Holt appeals his voluntary-manslaughter conviction and sentence.

## Analysis

Holt challenges the denial of his pretrial spoliation motion, the admission of Knight's expert testimony, the prosecutor's closing-argument statements about self-defense, and the substantive reasonableness of his sentence. We consider each in turn.

## I. Spoliation

The Due Process Clause "imposes a duty upon the government to preserve evidence 'that might be expected to play a significant role in the suspect's defense.'" *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024) (cleaned up) (quoting *United States v. Ludwig*, 641 F.3d 1243, 1253 (10th Cir. 2011)). Whether the government violates due process in failing to preserve evidence depends on the

---

[2] The district court also imposed a concurrent 96 months for the felon-in-possession conviction and three years of supervised release.

type of evidence at issue. *California v. Trombetta* applies when the evidence at issue has *apparent* exculpatory value and the defendant can't "obtain comparable evidence by other reasonably available means." 467 U.S. 479, 489 (1984). *Arizona v. Youngblood*, 488 U.S. 51 (1988), applies when the evidence is only "potentially useful" for the defense; to show a due-process violation under *Youngblood*, a defendant must also "show that the government acted in bad faith in destroying the evidence." *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994).

Because Holt does not argue that the purported bullet fragment has apparent exculpatory value under *Trombetta*, only *Youngblood* is at issue here. *Youngblood* defines "potentially useful evidence" as evidence about which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." 488 U.S. at 57. In other words, potentially exculpatory evidence has "latent, rather than patent" value. *Bohl*, 25 F.3d at 910.

The district court concluded that Holt failed to show the fragment had potentially exculpatory value. *See Johnson*, 99 F.4th at 1229, 1231 (noting burden on the defendant). It explained that because the fragment was discovered five months after the shooting, there was no link between them. The district court thus denied Holt's spoliation motion without reaching the issue of bad faith.

We review the district court's assessment for clear error.[3] *See Johnson*, 99

---

[3] The government suggests that we should review only for plain error because Holt failed to request an adverse-inference instruction. *See* Fed. R. Crim. P. 30(d). But Holt correctly highlights that he alleges a due-process violation caused by the government's bad-faith destruction of potentially exculpatory evidence, not an

F.4th at 1229; *United States v. Hood*, 615 F.3d 1293, 1299 (10th Cir. 2010). Under clear-error review, we won't reverse the district court's ruling "unless we have a definite and firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Walker*, 85 F.4th 973, 979 (10th Cir. 2023) (quoting *United States v. Merritt*, 961 F.3d 1105, 1111 (10th Cir. 2020)).

According to Holt, the purported bullet fragment was potentially exculpatory because testing could have revealed that it came from one of the three 9mm guns fired during the gunfight. Thus, Holt contends, the fragment could have corroborated his self-defense theory by showing that one of the 9mm guns known to be at the scene was fired at him. But this line of reasoning is ultimately too speculative to establish clear error. At the outset, it's not entirely clear that the metal fragment is a bullet fragment. The attorney who discovered it testified that he found "what [he] *thought* was a bullet." R. vol. 1, 1851 (emphasis added); *see also id.* at 1856 (describing it as "[a] piece of lead or a piece of copper bullet"). The officer who collected the fragment testified at trial that he wasn't sure if it came from a bullet; he referred to it as "a piece of metal." *Id.* at 1549. When defense counsel impeached the officer with preliminary-hearing testimony in which the officer had described the fragment as a bullet, the officer conceded only that "[i]t was *possibly* a [bullet] fragment." *Id.* at 1550 (emphasis added). And on redirect, the officer referred to the

___

instructional error. And because Holt adequately preserved his due-process claim by filing a pretrial spoliation motion, we reject the government's preservation argument.

fragment as a "small piece of, like, gold metal bullet fragment." *Id.* at 1551.

To be sure, the government acknowledges on appeal that "[t]esting might have confirmed whether the fragment came from a bullet." Aplee. Br. 24. But that, on its own, does not suffice to show the bullet fragment was "potentially useful evidence" to the defense. *Youngblood*, 488 U.S. at 58. Confirmation that the fragment came from a bullet would not establish when that bullet was fired or tie it to the August 1 shooting. Nor would it link the fragment to any particular gun; at best, testing *might* reveal the caliber of the weapon from which the bullet was fired, not the specific gun from which it was fired.

Recall that all we know about the specific 9mm guns fired during the shootout is that there were at "[a]t least three" of them. R. vol. 1, 1591. Law enforcement never recovered those weapons. The government's firearms witness could not specifically identify "what type of firearm" these three 9mm guns were, except that one was "likely . . . a Smith & Wesson M&P series 9mm Luger pistol." *Id.* at 1592. So even if testing could show that the fragment came from *a* 9mm gun, it would be speculative to infer that this theoretical 9mm gun was one of the three unidentified 9mm guns that fired shots on August 1. Indeed, that inference becomes even more speculative when we recall that the fragment wasn't collected immediately or even shortly after the incident. Instead, the fragment was discovered five months after the August 1 shooting in an area where multiple shootings have occurred. All told, for the metal fragment to have potentially exculpatory value based on Holt's theory, we would have to assume that it could have been shown to be a bullet fragment, could

10

have been dated to August 1, and could have been connected to a specific and unrecovered 9mm used on August 1. That's at least one assumption too many.

We thus have no "definite [or] firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Walker*, 85 F.4th at 979 (quoting *Merritt*, 961 F.3d at 1111). With the district court's finding of no potentially exculpatory value intact, Holt cannot establish a *Youngblood* violation, and we affirm the district court's order denying his spoliation motion.[4]

## II.     Expert Testimony

Holt next argues that the district court erred in admitting Knight's expert testimony. Expert testimony is governed by Federal Rule of Evidence 702, which "requires federal courts to ensure that expert testimony 'is not only relevant, but reliable.'" *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). The district court must first assess the witness's qualifications: "whether the witness has the requisite 'knowledge, skill, experience, training, or education' to provide an expert opinion." *Id.* (quoting Fed. R. Evid. 702 (2011)).[5] Second, the district court "determines

---

[4] Based on this conclusion, we need not reach the issues of bad faith or the proper remedy for a *Youngblood* violation.

[5] Although Rule 702 was amended in 2023, we follow the parties' lead and refer to the prior version of the rule that was in effect at the time of Holt's 2022 trial. *Cf. In re Cooper Tire & Rubber Co.*, 568 F.3d 1180, 1186 n.4 (10th Cir. 2009) (observing, in the context of the Federal Rules of Civil Procedure, "we cite the rule as it was in force at the time of the district court's decision").

whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* (cleaned up) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009)). A set of flexible and nonexclusive factors guide the reliability inquiry: "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community." *Id.* at 845–46.

Applying these standards, the district court first recited Knight's certifications and experience and found him "qualified to opine as an expert on crime[-]scene investigations, including on the general reconstruction of bullet trajectories." R. vol. 1, 568. As to the reliability of Knight's methodology, the district court faulted the government for "summariz[ing] . . . Knight's report rather than describing his methodology." *Id.* But it ultimately concluded that Knight's "numerous qualifications" and OSBI's standing as "one of the main investigative bureaus in Oklahoma" were "sufficient" to establish the reliability of "Knight's anticipated testimony." *Id.* at 569. Thus, the district court denied Holt's motion to exclude expert testimony.

We review de novo "whether the district court applied the proper legal test in admitting an expert's testimony," including "whether the district court applied the proper standard and actually performed its gatekeeper role in the first instance." *United States v. Pehrson*, 65 F.4th 526, 541 (10th Cir. 2023) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003)). But we review the "actual

12

application of the standard in deciding whether to admit or exclude an expert's

testimony for abuse of discretion."[6] *Id.* (quoting *Dodge*, 328 F.3d at 1223).

We begin with Holt's argument that the district court abdicated its gatekeeping

role by permitting Knight's qualifications to stand in for the reliability of his

methods. Despite the district court's "discretion in *how* it conducts the gatekeeper

function, . . . it has no discretion to avoid performing the gatekeeper function." *Id.*

(quoting *Dodge*, 328 F.3d at 1223). The applicable legal test has at least two distinct

steps: qualifications and reliability. *See Foust*, 989 F.3d at 845. And, as Holt argues,

the district court essentially collapsed these two inquiries. To be sure, this is a less

glaring problem than what occurred in the case Holt cites in support, *Goebel v.*

*Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000). There, we

reversed and remanded because "[t]here [wa]s not a single explicit statement on the

record to indicate that the district court ever conducted any form of *Daubert* analysis

---

[6] The government again argues for plain-error review, faulting Holt for not renewing his objection to Knight's testimony during trial and for purportedly failing to raise a gatekeeping objection. For support, the government relies on *United States v. Nevels*, 490 F.3d 800 (10th Cir. 2007), and *United States v. Mathews*, 928 F.3d 968 (10th Cir. 2019). Both are easily distinguished. In *Nevels*, we applied plain error to an evidentiary challenge under Federal Rule of Evidence 403 because the defendant "failed to timely renew his objection at trial after the district court previously denied without prejudice his pretrial motion to exclude the testimony." 490 F.3d at 805. Here, however, the district court's denial of Holt's motion to exclude Knight's testimony was not specifically designated "without prejudice." Instead, in contrast to some of Holt's limine motions which were denied without prejudice, the district court issued a definitive and final ruling on the arguments that Holt now advances on appeal. And in *Mathews*, the defendant never challenged the reliability of the expert's opinions below. 928 F.3d at 979. Here, by contrast, Holt expressly challenged the reliability and methodology of Knight's opinions. Under these circumstances, we conclude that Holt adequately preserved his arguments on this issue.

whatsoever." *Id.* at 1088. Here, by contrast, the district court did explain its reasoning—reasoning that collapsed two aspects of the Rule 702 test.

We will assume for purposes of argument that the district court improperly "avoid[ed] performing the gatekeeper function" by collapsing the qualification and reliability inquiries. *Pehrson*, 65 F.4th at 541 (quoting *Dodge*, 328 F.3d at 1223). But "a district court's insufficient gate[]keeping findings may not warrant reversal if the appellee can persuade us the error was harmless." *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1190–91 (10th Cir. 2014). In this harmlessness analysis, we "evaluate the ruling in light of evidence presented at trial." *United States v. Hunt*, 63 F.4th 1229, 1244 (10th Cir. 2023). "If it is readily apparent from the record that the expert testimony was admissible, it would be pointless to require a new trial at which the very same evidence can and will be presented again." *Id.* (cleaned up) (quoting *Storagecraft*, 744 F.3d at 1191).

The record here meets this standard. At trial, Knight testified about both his normal methods and those he employed to investigate the shooting. He explained that "[t]rajectories from bullet defects can be measured based upon impact angles" and that he typically measured trajectories, when possible, with a string and protractor, trajectory rod, or laser. R. vol. 1, 1645. He further explained that at this particular crime scene, he did not have a laser or a sufficiently long trajectory rod, and "there were some time constraints of a late-night crime scene." *Id.* at 1733. So he used a flashlight in lieu of a laser, shining it "through the defects themselves in order to see that they lined up." *Id.* at 1732. He additionally explained how the shape of bullet

14

defects—round versus elongated—informed his analysis of each bullet's trajectory.

Applying these methods to the trajectory of the bullet that killed Scales, Knight explained that the "mostly round" shape of the defect in the minivan's pillar indicated that the bullet had been fired directly from the east and not at an angle. *Id.* at 1691. He further explained, with photographs, how the fatal bullet grazed the top of the vehicle next to the minivan, leaving a shallow, elongated, "ricochet defect" on the vehicle, further supporting an east-to-west trajectory, before ultimately striking Scales. *Id.* at 1694.

Holt nevertheless argues that Knight's methods were unreliable because Knight did not use a string, protractor, or laser, made his measurements at night, and accounted for neither elevation nor Holt's and Scales's precise locations. In light of Knight's trial testimony, Holt's criticisms, though not unreasonable, do not convince us that Knight's methodology was so unreliable as to be inadmissible. As the government puts it, "that Knight was unable to use the 'preferred method' of tracing trajectories does not mean his data and methods were unreliable." Aplee. Br. 43 (quoting R. vol. 1, 1740). And we see nothing in the record, including in defense counsel's thorough cross-examination of Knight on various weaknesses in his methodology, to suggest that the district court would have excluded Knight's testimony as unreliable. In fact, Knight's trial testimony tends to suggest that the methods he employed were "similar" in effect to those he normally would use to determine a trajectory, R. vol. 1, 1732, and Holt doesn't challenge the reliability of Knight's preferred methods. Based on this record, we conclude that any gatekeeping

15

error was harmless.

Moving on, Holt argues that the district court abused its discretion in admitting Knight's testimony because Knight was not qualified. But Holt takes no issue with Knight's qualifications for determining bullet trajectories generally—he focuses instead on the final portion of Knight's trajectory testimony related to how the bullet struck Scales's head. Doing so, Holt argues that Knight was not qualified to testify about forensic pathology, emphasizing Knight's lack of medical training.

We are unpersuaded by Holt's attempt to recast Knight's testimony as related to forensic pathology. As the government notes, "forensic pathology" is a "branch of medicine that establishes or interprets evidence dealing with diseases and disorders of the body, esp[ecially] those that cause death." *Forensic pathology*, Black's Law Dictionary (12th ed. 2024). And although Knight certainly described the wound that caused Scales's death, he did not interpret the wound in connection with the cause of Scales's death, as a pathologist would do (and as the government's medical examiner did). Rather, he interpreted that wound in connection with the trajectory of the bullet. For example, Knight said that the wound in Scales's head—a wound he described as a "defect," in keeping with his description of other physical objects that were struck by bullets—was "consistent with the shape of a severely deformed gray metal bullet." R. vol. 1, 1709. He continued by explaining that because "the margins or the edges of the wound itself were not circular, . . . it wasn't an intact, spin-stabilized bullet that struck Scales, but rather a bullet fragment." *Id.* This testimony tracks Knight's training and experience in crime-scene investigation, an area of Knight's

16

qualifications that Holt doesn't challenge.

Holt's argument essentially severs the final portion of the bullet's trajectory from all that came before it. He contends that "Knight is not qualified in any scientific, medical, or biological discipline to opine on the physiological effects of a bullet or fragment entering a human body." Rep. Br. 17 (cleaned up). But again—Knight didn't testify about the physiological effects of the fragment on Scales's body. He testified about the shape of the bullet hole in support of his overall expert analysis of the fatal bullet's likely trajectory. And importantly, Holt doesn't dispute that Knight was qualified to discuss bullet trajectories generally. It's not an abuse of discretion to allow a bullet-trajectory expert with unchallenged qualifications to testify about the final point on a bullet's path. Thus, as the government states, "[e]ven if Knight's testimony strayed close to the boundaries of his expertise, the district court did not . . . abuse its ample discretion in admitting the testimony." Aplee. Br. 41.

In sum, any gatekeeping error as to the reliability of Knight's expert opinion was harmless, and the district court did not abuse its discretion in permitting Knight's trajectory testimony to extend to the manner in which the bullet fragment likely struck Scales. For these reasons, we affirm the district court's order denying Holt's motion to exclude Knight's testimony.

## III. Prosecutorial Misconduct

Holt next advances a prosecutorial-misconduct argument based on supposed misstatements in the prosecutor's closing argument. When, as here, "the defendant

objects and the court overrules the objection," we review prosecutorial-misconduct arguments de novo.[7] *United States v. Currie*, 911 F.3d 1047, 1056 (10th Cir. 2018).

"Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial." *Id.* at 1055. It can take various forms, including, as relevant here, "misstat[ing] the law in . . . closing argument." *Id.* (quoting *United States v. Hollis*, 971 F.2d 1441, 1455 (10th Cir. 1992)). "The misconduct analysis proceeds in two steps: (1) . . . whether the prosecutor's comments were improper, and (2) if they were, . . . the likely effect of the comments on the jury's verdict." *Id.* "We examine alleged improper comments in context" and "'should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning.'" *Id.* at 1056 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)).

Holt argues that the prosecutor misstated the law of self-defense by implying that Holt had a duty to retreat. To fully assess Holt's argument, we first set out the challenged portion of the closing argument in some detail. We then review relevant self-defense law before assessing whether the prosecutor misstated that law.

During rebuttal closing argument, the prosecutor suggested that Holt's self-

---

[7] For the third time, the government suggests that we should review for plain error, essentially faulting Holt for failing to use the words "prosecutorial misconduct" in his objection. We decline to take this magic-words approach to preservation. Defense counsel objected on grounds that the prosecutor had "misstate[d] the instructions." R. vol. 1, 2310. Misstating the instructions is one example of prosecutorial misconduct, so Holt preserved this issue. *See United States v. Anaya*, 727 F.3d 1043, 1052–53, 1059 (10th Cir. 2013) (treating objection based on "improper argument" as one directed at prosecutorial misconduct).

defense theory failed because Holt "set the situation up" and because Holt "is only allowed to use force that is necessary." R. vol. 1, 2310. Expanding on that idea, the prosecutor continued: "In other words, you have to find that he did what he did because he didn't have any other options. But he did. He obviously did. He was already behind the dumpster. He could have stayed there." *Id.* After the district court overruled defense counsel's "misstates the instructions" objection, the prosecutor carried on, stating that Holt "could have stayed behind the dumpster. His car was right there. He could have done anything other than what he actually did." *Id.* Wrapping up, the prosecutor stated that what Holt did was "not self-defense" but "a total disregard for human life" and "completely unnecessary." *Id.* at 2311. He asked the jury to convict Holt of murder.

The district court then sent the jury back to deliberate with an unchallenged self-defense instruction: "[a] person may use force which is intended or likely to cause death or great bodily harm only if he reasonably believes that force is necessary to prevent death or great bodily harm to himself or another." *Id.* at 928. The instruction directed the jury that to find Holt guilty, it must conclude that the government proved beyond a reasonable doubt that either "[Holt] did not act in self-defense" or that "it was not reasonable for [Holt] to think that the force he used was necessary." *Id.*

Turning to the relevant legal principles, "[s]elf-defense only requires the defendant's reasonable belief that deadly force was necessary, *not that he exercise a duty to retreat or recognize the unavailability of reasonable alternatives*." *United*

19

*States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014) (emphasis added). In other words, there is "no legal obligation to retreat or consider alternatives so long as [the defendant] reasonably believed deadly force was necessary." *United States v. Hicks*, 116 F.4th 1109, 1121 (10th Cir. 2024). Crucially, though, the jury "may consider a defendant's ability or opportunity to retreat as a factor in assessing whether his use of deadly force was reasonably necessary to defend himself or another under the circumstances." *Id.* at 1118.

Here, when contextualized by the jury instructions and the prosecutor's overall statements, the prosecutor did not state that Holt had a legal duty to retreat. Instead, in alignment with the caselaw, he urged the jury to consider the possibility of retreat when assessing the reasonableness of Holt's use of defensive force. To be sure, the prosecutor said that to accept Holt's self-defense claim, the jury "ha[d] to find that he did what he did because he didn't have any other options." R. vol. 1, 2310. In a vacuum, that comes close to suggesting a legal duty to retreat. But we won't "lightly infer" that the prosecutor intended this "remark to have its most damaging meaning." *Currie*, 911 F.3d at 1056 (quoting *Donnelly*, 416 U.S. at 647). Moreover, in context, the prosecutor was not misstating the law and was instead discussing the reasonableness of Holt's use of force: his preceding statement told the jury that even if it thought "that [Holt] was somehow justified in firing some shots, he nonetheless is only allowed to use force that is necessary." R. vol. 1, 2310. In that light, the commentary about Holt's ability to remain behind the dumpster is proper argument about the reasonableness of his use of force in self-defense. And although the

prosecutor continued, after the overruled defense objection, to list other options available to Holt, he closed the loop by returning to the idea that Holt's use of force was "completely unnecessary." *Id.* at 2311. This bookended the discussion of Holt's other options within the correct legal framework.

Contrary to Holt's argument, this case is unlike *Hicks*. There, we reversed and remanded for a new trial based on the failure to instruct the jury that there was no legal duty to retreat. *Hicks*, 16 F.4th at 1117–21. Aside from the obvious point that *Hicks* involved a different kind of challenge, *Hicks* is also distinguishable on the facts. The government there made failure to retreat a centerpiece of its case, from opening to closing, including a detailed cross-examination of the defendant about why he did not take various alternatives to using force. *Id.* at 1118–21. So when the district court failed to instruct the jury on no duty to retreat, as the defendant requested, it "left the jury in the dark as to the applicable law." *Id.* at 1121. Here, by contrast, Holt points only to the prosecutor's single mention about the possibility of retreat—a mention that was appropriately couched as something that rendered Holt's use of force unreasonable. We therefore conclude that the prosecutor did not misstate the law, and we need not reach the second step of assessing the likely effect of any misstatement on the verdict.[8]

---

[8] Having assumed only one trial error, we need not address Holt's cumulative-error argument. *See United States v. Butler*, 141 F.4th 1136, 1149–50 (10th Cir. 2025) ("Cumulative error requires more than one error.").

## IV.     Sentence

Last, Holt argues that his above-Guidelines, 15-year sentence is substantively unreasonable. "'We review substantive reasonableness for an abuse of discretion[]' and will uphold the sentence imposed unless the sentencing decision 'exceeds the bounds of permissible choice, given the facts and the applicable law.'" *United States v. Lewis*, 116 F.4th 1144, 1177–78 (10th Cir. 2024) (quoting *United States v. Ware*, 93 F.4th 1175, 1180 (10th Cir. 2024)). Substantive reasonableness "involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in . . . § 3553(a)." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1215 (10th Cir. 2008) (quoting *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007)). "We do not apply 'a rigid mathematical formula that uses the percentage of a departure or variance as the standard for determining the strength of the justifications required for a specific sentence.'"[9] *United States v.*

---

[9] We pause to question the extent to which this now-traditional § 3553(a) substantive-reasonableness analysis applies when reviewing a Guidelines-based departure, as opposed to a variance premised on the § 3553(a) factors. "Departures are 'non-Guidelines sentences imposed under the framework set out in the Guidelines," whereas variances "are 'non-Guidelines sentence[s] arising from a district court's case-specific analysis of the sentencing factors in § 3553(a).'" *United States v. Barnes*, 141 F.4th 1156, 1160 (10th Cir. 2025) (quoting *United States v. Vazquez-Garcia*, 130 F.4th 891, 899 (10th Cir. 2025)). The two "are analytically distinct." *Vazquez-Garcia*, 130 F.4th at 899 (quoting *United States v. Martinez-Barragan*, 545 F.3d 894, 900 (10th Cir. 2008)).

We have suggested that appellate review of the substantive reasonableness of a departure sentence differs from that of a variant sentence and proceeds under a four-part test. *See Alapizco-Valenzuela*, 546 F.3d at 1215–16 (stating that review of whether sentence outside Guidelines range "is substantively reasonable . . . hinges on the method by which the district court selects the" sentence: a four-part test for departures and abuse-of-discretion review for variances); *United States v. Adams*,

*Garcia*, 946 F.3d 1191, 1212 (10th Cir. 2020) (cleaned up) (quoting *United States v. Sample*, 901 F.3d 1196, 1199 (10th Cir. 2018)).

Here, recall that the district court sentenced Holt to 180 months, an upward departure from the Guidelines range of 87 to 108 months. In so doing, the district court relied on U.S.S.G. § 5K2.0(a)(3), which authorizes a departure in certain "exceptional" cases where "the circumstance that forms the basis for the departure is taken into consideration in determining the [G]uideline[s] range" but "the court determines that such circumstance is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in that kind of offense." The district court reasoned that Holt's conduct in firing over 20 rounds from an AK-47 toward a crowd while crouching behind a dumpster was an extreme and extraordinary circumstance considered, but not fully captured, by the Guidelines range. The district court considered it "a miracle that no one else was shot." R. vol. 3, 108.

The district court also explained that this sentence was warranted under several § 3553(a) factors. For example, it noted, as a matter of history and characteristics, that Holt had one prior juvenile offense and one prior adult conviction that both

---

751 F.3d 1175, 1181–82 (10th Cir. 2014) (contrasting "strict" four-part review of departures with "limited" review of variances). *But cf. United States v. Begaye*, 635 F.3d 456, 462 (10th Cir. 2011) (holding that "a unitary abuse of discretion standard" applies when considering each prong of the four-part test (quoting *Alapizco-Valenzuela*, 546 F.3d at 1215)); *United States v. Flinn*, 987 F.2d 1497, 1501 (10th Cir. 1993) (suggesting that fourth prong of departure review considers both the justification offered by the district court *and* factors also found in § 3553(a)).

However, we need not resolve this issue. The parties present this sentencing challenge as a matter of § 3553(a) substantive reasonableness and do not brief the four-part test for departure sentences. We follow their lead.

involved firearms, as well as "some history of substance abuse and . . . some mental[-]health concerns since he's been incarcerated." *Id.* at 109; *see also* § 3553(a)(1). And it concluded that a 15-year sentence would "reflect the seriousness of the offense, serve as an adequate deterrent . . . , promote respect for the law, provide just punishment for the offense, and provide protection for the public from further crimes by the defendant, as well as provide correctional treatment . . . in the most effective manner." R. vol. 3, 109; *see also* § 3553(a)(2).

On appeal, Holt argues that the district court abused its discretion by focusing almost exclusively on the seriousness and circumstances of the offense. It's true that "[a] district court should not rely solely on one § 3553(a) factor without addressing other relevant factors." *United States v. Crosby*, 119 F.4th 1239, 1247 (10th Cir. 2024). But that's not what happened here. The district court considered several other § 3553(a) sentencing factors, noting, for example, that Holt had two prior firearms offenses and discussing the need to promote respect for the law and provide protection to the public. And it was not an abuse of discretion for the district court to focus heavily on the recklessness of firing at least 20 rounds from an AK-47 into a crowd and discount various mitigating factors, including that Holt did not fire first and had a reasonable claim to self-defense.

Holt relatedly contends that the district court abused its discretion by failing to account for certain § 3553(a) factors. He asserts that by imposing the statutory maximum, the district court must have given no weight to various mitigating circumstances described in the PSR and the sentencing memorandum, including his

24

steady work history, his desire to be a good father, and his plans to improve his life and provide for his family. As the government notes, the district court acknowledged all this mitigation evidence, albeit after formally announcing the sentence. And we defer to the district court's weighing of the sentencing factors, even though Holt believes the mitigating evidence should have been weighed differently. *Cf. United States v. Cookson*, 922 F.3d 1079, 1094 (10th Cir. 2019). Here, the district court plainly considered Holt's mitigating factors; it simply chose to place no weight on them, or to place significantly less weight on them than on the seriousness of the offense. That was not an abuse of discretion.

Last, Holt argues that the district court created an unwarranted sentencing disparity. As he did below, he highlights that the average and median sentences for voluntary manslaughter for criminal defendants in criminal-history category I were 82 and 83 months. But the average and median sentences do not account for the specific conduct underlying Holt's offense—conduct that the district court judged to be well outside the heartland of voluntary-manslaughter cases. *See* § 3553(a)(6) (directing courts to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"). We thus affirm Holt's sentence as substantively reasonable.

## Conclusion

Because the district court did not clearly err in concluding that the late-discovered, purported bullet fragment lacked potentially exculpatory value, we affirm the order denying Holt's spoliation motion. Next, even if the district court legally

25

erred in assessing the reliability of Knight's expert opinion, that error was harmless in light of record evidence establishing reliability. And the district court did not abuse its discretion in permitting Knight's otherwise-qualified trajectory testimony to include discussing the nature of Scales's entry wound. Further, Holt's prosecutorial misconduct argument fails because the prosecutor's closing argument appropriately couched the discussion of Holt's other options within discussion of the reasonableness of his use of force and did not misstate the law. Finally, Holt's sentence is substantively reasonable. Finding no error, we affirm.